UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

CHARLES WADE MCGAHA,                    )
                                        )
        *Petitioner,*                   )
v.                                      )        No. 2:12-CV-75
                                        )
GERALD MCALLISTER, WARDEN,              )
Northeast Correctional Complex,         )
                                        )
        *Respondent.*                   )
                                        )

## MEMORANDUM OPINION

Charles Wade McGaha ("Petitioner"), a Tennessee inmate acting *pro se*, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the legality of his confinement under a 2006 Cocke County, Tennessee Criminal Court judgment [Doc. 2]. A jury convicted Petitioner of first degree felony murder and aggravated assault, for which he is serving a life sentence. Respondent has filed an answer to the petition, which is supported by copies of the state record [Docs. 6–7]. Respondent subsequently filed a motion to construe the answer as a motion for summary judgment [Doc. 10], which the Court denied [Doc. 13]. Petitioner has failed to respond to Respondent's answer, and the time for doing so has passed.

## I.    PROCEDURAL HISTORY

Petitioner's convictions were affirmed on direct appeal by the Tennessee Court of Criminal Appeals ("TCCA"), *see State v. McGaha*, No. E2006-01984-CCA-R3-CD, 2008 WL 148943 (Tenn. Crim. App. Jan. 16, 2008), and the Tennessee Supreme Court denied permission to appeal. Petitioner's subsequent application for post-conviction relief was denied by the trial court, and affirmed on appeal by the TCCA. *McGaha v. State*, No. E2010-01926-CCA-R3-PC,

2011 WL 2162987 (Tenn. Crim. App. May 26, 2011). The Tennessee Supreme Court denied permission to appeal. Petitioner next filed this timely petition for habeas relief.

## II.    BACKGROUND

The following summary of the factual background is taken from the TCCA's opinion on direct appeal of Petitioner's conviction.

> On May 31, 2004, James Quinton Cox (the victim) was shot to death at the home of Lisa Mathis in Cocke County. Subsequently, the [Petitioner] was indicted for the first degree murder of Cox and one count of aggravated assault against Mathis. The [Petitioner's] nephew, James Wesley Daniels, was also indicted for offenses arising out of the same incident. The two men were tried jointly.
>
> At trial, the Cocke County Director of 9-1-1, Kathy Cody, testified that on May 31, 2004, two emergency calls were made regarding the shooting, one from the residence of Lisa Mathis and another from a neighboring home. Audiotapes of the calls were admitted in evidence.
>
> Lisa Mathis testified that she lived in a mobile home located at 115 Horn Way in Newport. Prior to the events of May 31, 2004, she did not know either the [Petitioner] or co-defendant Daniels. However, that evening while Mathis was at her house with the homicide victim and Charles Adams, Daniels arrived uninvited, came in the front door, looked at the homicide victim and said, "We have a problem." After picking up a baseball bat, Mathis told Daniels to leave. As Daniels backed out the front door, he said, "I'll be back with something more than a stick."
>
> At approximately 10:15 p.m. that night, Daniels returned to Mathis's house, and the [Petitioner] was with him. At that time, there were five people in the two-bedroom mobile home: Mathis was in the kitchen and Charles Adams was in the living room, while the victim was in a back bedroom with Michael Benson and David Shults. Mathis saw that Daniels had a handgun when he got out of his car, and she called 9-1-1 as he entered and walked past her through the living room toward the back of the mobile home.
>
> The [Petitioner]—who was armed with a rifle—followed Daniels inside, pointed the rifle at Mathis's head and said, "Drop the phone." The [Petitioner] then asked her "where the son of a bitch was," and she assumed he meant the victim. At that point, Mathis became "hysterical": she dropped the telephone, threw up her hands, got on her knees and started screaming. The [Petitioner]

2

did not shoot at her, but he held the rifle "in her face" so close that she "could have grabbed the barrel from where she was standing." They heard a gunshot from the rear of the house, and the [Petitioner] ran to the bedroom where the victim was located. Mathis then ran out of the house. As she fled to her closest neighbor's home, she heard a second gunshot, and testified that it was "a different type shot." When she arrived at her neighbor's she was still "hysterical" and screaming that there were "people in [her] house with guns." Her neighbor called 9-1-1.

The audiotape of Mathis's initial 9-1-1 telephone call (placed from her residence) was played for the jury. While listening the recording, Mathis identified her own voice and the voice of Michael Benson saying, "I just want to leave." She also identified the [Petitioner's] voice demanding, "[W]here's the son of a bitch at?" On cross-examination, Mathis stated that she thought the four men in her house that day had been drinking, but that she was "not sure"; however, she did not see anyone at her house using cocaine that day.

Michael Benson testified that he was at Mathis's house on May 31, 2004. He arrived there "between 8:00 and 9:00 p.m. with David Shults. At some point, Shults and the victim took Mathis to a store where she purchased beer. After bringing her back to the house, the two men again went out and purchased drugs. After they returned, Benson went into a back bedroom with the victim, David Shults and Charles Adams. Benson said they "were getting ready to use drugs," when Daniels entered the bedroom "with a pistol and pointed it at the victim." While Daniels was "waiving" the pistol at the victim and yelling, Benson "hit the door a flying" and ran outside. Benson passed the [Petitioner] in the living room on his way out and said the [Petitioner] was holding a rifle. While hiding behind a tree, Benson heard two gunshots. He then saw two cars leave and confirmed that one car belonged to David Shults. The second car was a Subaru, but Benson did not know to whom it belonged.

Charles Adams testified that he knew the victim and that he had known the [Petitioner] and Daniels most of his life. On May 31, 2004, Adams went to Mathis's house with the victim. While they were at the mobile home that evening, Daniels arrived, came inside and told the victim that "they had a problem." Mathis picked up a baseball bat and told him to leave, and as he was leaving, Daniels said "he'd be back with more than a baseball bat."

According to Adams, after Daniels left he and Mathis watched television in the living room and the victim went into a back bedroom with two men Adams did not know. "A little later,"

3

Daniels came back to the house and the [Petitioner] was with him. When he saw Daniels and the [Petitioner] "on the steps," Adams went into the back bedroom to warn the victim that "they had come back." Daniels came inside the bedroom first, and he was armed with a pistol. "He shot it and when he shot it him and the victim got into a quarrel and started wrestling." The [Petitioner] then came into the bedroom armed with an "assault rifle" outfitted with "two banana clips taped together." Adams testified that while in a "wrestling hold" with the victim, Daniels "said shoot this S.O.B. and the [Petitioner] shot him" with the rifle from a distance of approximately four feet.

Daniels then pointed his pistol at Adams and "acted like he pulled the trigger," then he told the [Petitioner] to shoot Adams. The [Petitioner] responded that he would not shoot Adams because they were friends. As Daniels and the [Petitioner] left the bedroom, Daniels said, "Say it was self defense." Adams watched the [Petitioner] and Daniels drive away in a Subaru. Asked whether there was any doubt in his mind that [Petitioner] shot the victim, Adams answered: "No, sir."

Eryn Wilds testified that she was working at a "BP" gas station in Newport on the day of the incident. Daniels came to the gas station twice that day. On the second occasion, he arrived at approximately 10:15 p.m. driving a Subaru and was acting "sort of hyper." There was another white male in the car with Daniels whom Wilds could not identify.

Detective Derrick Woods of the Cocke County Sheriff's Department testified that he led the investigation of the homicide. He arrived at Mathis's home at approximately 11:00 p.m. on May 31, 2004, and saw that the victim was dead on the floor in a back bedroom with a single bullet exit wound on the upper-right-side of his chest and blood splatter on his face. The bullet entry wound was on the lower-left-side of the victim's back. Based on where the body was and the location of a bullet hole in the bedroom wall, Detective Woods opined that the "shooter" would have been standing in the doorway coming into the bedroom. There was also a bullet hole that went "through the mattress, through a pillow," and through the side of the trailer.

Detective Woods informed that one cartridge casing from a rifle bullet was found on the floor beside a night stand, and a handgun cartridge was discovered on the bed. Detective Woods submitted both cartridges to the Tennessee Bureau of Investigation Crime Laboratory for analysis. The crime laboratory report confirmed that the cartridge casing recovered from the bedroom floor was a "7.62 by 39 mm caliber rifle cartridge" casing and that the

cartridge casing recovered from the bed was from a "40 caliber" Smith and Wesson cartridge. No fingerprints were recovered from either cartridge casing. Because both bullets fired in the bedroom exited the trailer, neither was recovered. No firearms were discovered at the crime scene, and the murder weapon was never found. According to Detective Woods, the [Petitioner] and Daniels turned themselves in to authorities the day after the shooting.

The parties stipulated that the Tennessee Bureau of Investigation's examination of items removed from a 1985 Subaru "failed to indicate the presence of blood." Further, they stipulated that analysis of a vitreous sample taken from the victim, as well as an analysis of his blood and urine revealed that he had a blood alcohol content between .19 and .25 percent when he died. Additionally, the victim had marijuana and cocaine in his system.

Kim Fine testified that she was the victim's girlfriend. Approximately two and a half to three years ago before she dated the victim, Fine had been Daniels's girlfriend. She lived with Daniels for eight months and explained that on "several occasions," Daniels would speak of the victim and say that if he ever "ran into him one of the two of them would die." The victim had informed Fine as to the nature of the dispute between him and Daniels, but this information was not disclosed during her testimony.

Dr. Darinka Mileusnic-Polchan testified that she was a forensic pathologist, an Assistant Professor of Pathology at the University of Tennessee Medical Center and an Assistant Chief Medical Examiner for Knox County. Testifying as an expert in forensic pathology, she stated that she conducted an autopsy on the victim and opined that his cause of death was "a single gunshot wound to the back which perforated the left lung and tore the heart and exited the body on the front. It was a through and through gunshot wound of the back that involved the chest organs that caused internal bleeding." Dr. Mileusnic-Polchan also deduced that the victim was shot from a close range while he was "standing up and potentially slightly bent over."

Neither the [Petitioner] nor Daniels testified, and no witnesses were called by the defense.

After deliberations, the jury convicted the [Petitioner] of the first degree murder of the victim and the aggravated assault of Mathis. The trial court imposed a life sentence for his first degree murder conviction because the State did not seek a sentence of life without parole or the death penalty. Following a separate sentencing

5

hearing, the trial court sentenced the [Petitioner] as a Range II, multiple offender to ten years for the aggravated assault conviction and ordered the sentence to be served concurrently.

*McGaha*, 2008 WL 148943, at *1–4 (footnotes omitted).

## III.    STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified in 28 U.S.C. § 2254, *et. seq*., a court considering a habeas claim must defer to any decision by a state court concerning the claim, unless the state court's judgment: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)–(2).

A state court's decision is "contrary to" federal law when it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or resolves a case differently on a set of facts which cannot be distinguished materially from those upon which the precedent was decided. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Under the "unreasonable application" prong of § 2254(d)(1), the relevant inquiry is whether the state court decision identifies the legal rule in the Supreme Court cases which govern the issue, but unreasonably applies the principle to the particular facts of the case. *Id*. at 407. The habeas court is to determine only whether the state court's decision is objectively reasonable, not whether, in the habeas court's view, it is incorrect or wrong. *Id*. at 411.

The § 2254(d) standard is a hard standard to satisfy. *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (noting that "§ 2254(d), as amended by AEDPA, is a purposefully demanding standard . . . 'because it was meant to be.'" (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)). Further, findings of fact which are sustained by the record are entitled to a

presumption of correctness—a presumption which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## IV. ANALYSIS

Petitioner's § 2254 habeas corpus petition raises seven main grounds for relief: (1) several instances of ineffective assistance of counsel; (2) that the trial court erred by failing to grant a mistrial after members of the jury saw Petitioner enter the court in shackles; (3) insufficient evidence to support the convictions; (4) that there was no proof of premeditation to support the first degree murder verdict; (5) that the trial judge erred by failing to recuse himself upon the challenge of the appearance of impropriety; (6) prosecutorial misconduct; and (7) actual innocence.

In his answer, Respondent argues that Petitioner is not entitled to relief on one of his ineffective assistance of counsel claims and on grounds six and seven because they are procedurally barred [Doc. 6]. Respondent also argues that Petitioner is not entitled to relief on his remaining claims because the state court decisions rejecting the claims on their merits are entitled to deference under 28 U.S.C. § 2254 [Doc. 6].

The Court agrees with Respondent concerning Petitioner's entitlement to habeas relief, and for the reasons which follow, will **DENY** and **DISMISS** this case.

### A. Procedural Default

#### 1. Applicable Law

Under 28 U.S.C. § 2254(b), a federal court's jurisdiction to hear a habeas claim is limited to those cases in which a petitioner has exhausted all available state-court remedies. The statute provides that:

> (1)     An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a state court shall
> not be granted unless it appears that—
>> (A)     the applicant has exhausted the remedies available
>> in the courts of the State; or
>> (B)      (i) there is an absence of available State corrective
>> processes; or
>>> (ii) circumstances exist that render such process
>>> ineffective to protect the rights of the applicant.
> (2)     An application for a writ of habeas corpus may be denied
> on the merits, notwithstanding the failure of the applicant to
> exhaust the remedies available in the courts of the State.

28 U.S.C. § 2254(b); *see also Granberry v. Greer*, 481 U.S. 129, 133–34 (1987); *Rose v. Lundy*,

455 U.S. 509, 519 (1982).

A petitioner must present each factual claim to the state court as a matter of federal law.

*See Gray v. Netherland*, 518 U.S. 152, 163 (1996). In essence, a claim sought to be vindicated in

a federal habeas proceeding must have been raised in the state courts so that the state courts have

the first opportunity to hear the claim. "Where a petitioner has not fully and fairly presented a

federal claim to the state's highest court . . ., a federal court will not consider the merits of that

claim unless petitioner can show cause to excuse his failure to present the claims appropriately in

state court, and actual prejudice as a result." *Stanford v. Parker*, 266 F.3d 442, 451 (6th Cir.

2001) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Cause for a procedural default

depends on some "objective factor external to the defense" that interfered with the petitioner's

efforts to comply with the procedural rule. *Coleman*, 501 U.S. at 753 (citing *Murray v. Carrier*,

477 U.S. 478, 488 (1986)).

## 2.     Discussion

Respondent argues that Petitioner failed to exhaust the following claims in state court: (1)

that his trial counsel was ineffective for failing to preserve the record and effectively appeal the

trial court's refusal to recuse itself; and (2) that the state engaged in several instances of prosecutorial misconduct.[1]

### a. Ineffective assistance of counsel for failing to preserve the record and appeal issue of trial court's recusal.

Petitioner argues that his trial counsel, Joann Sheldon, failed to properly preserve and argue the issue of his trial judge's impartiality, after the trial judge was accused of engaging in an improper conversation with the victim's family members by Petitioner's co-defendant [Doc. 2]. Petitioner alleges that trial counsel was ineffective for failing to investigate and examine the trial judge about the interaction with the victim's family [Doc. 2]. Respondent correctly points out that this claim was not presented to the state court and, therefore, it is procedurally defaulted [Doc. 6].

Furthermore, the Court notes that Petitioner is not entitled relief on this claim under the *Martinez* exception. In *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), the Supreme Court created a narrow exception to the general rule of *Coleman* that a habeas petitioner cannot use ineffective assistance of collateral review counsel to excuse a procedural default. 501 U.S. at 756–57. Under the *Martinez* exception, which was made applicable to Tennessee by *Sutton v. Carpenter*, 745 F.3d 787 (2014), a petitioner may establish cause to excuse a procedural default of an ineffective assistance of trial counsel claim by showing that he received ineffective assistance by post-conviction counsel. *See Martinez*, 132 S. Ct. at 1320. However, to be successful under *Martinez*, a petitioner must show a substantial underlying claim of ineffective assistance of trial counsel. *Id.* at 1318–19; *see also Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013).

---

[1] Respondent also asserts that Petitioner's claim of actual innocence should be dismissed because it is procedurally barred [Doc. 6]. However, as the Court has chosen to deny the claim based on other grounds, the Court will address it separately.

9

Here, even under *Martinez*, Petitioner cannot show a substantial claim of ineffective assistance of trial counsel because counsel cannot be ineffective for failing to preserve or appeal a claim that she actually raised on appeal. The record indicates that Petitioner's trial counsel argued on appeal that the trial court's failure to recuse itself after the court's impartiality was challenged was improper [Doc. 7-8, p. 24]. As such, the Court cannot find that Petitioner has alleged sufficient cause and prejudice to overcome the procedural default of this claim. Accordingly, Petitioner's claim that he received ineffective assistance of counsel based on counsel's failure to preserve and appeal the issue of the trial court's recusal will be dismissed as procedurally barred from habeas review.

### b.  Prosecutorial Misconduct.

Petitioner also argues that he is entitled to habeas relief because of several instances of prosecutorial misconduct [Doc. 2]. Particularly, Petitioner argues that the prosecutor in his case committed a *Brady* violation, knowingly used perjured testimony, mentioned evidence that was not in the record, and failed to disclose information about promises of leniency given to prosecution witnesses [Doc. 2]. Respondent again correctly points out that Petitioner failed to raise these claims before the TCCA [Doc. 6]. As previously mentioned, a state prisoner must exhaust all constitutional claims by fully and fairly presenting them in a state court, before a federal court can consider them in a habeas proceeding. 28 U.S.C. § 2254(b)(1)(A), (C). Petitioner has not done so here, nor has he alleged any cause and prejudice to excuse this procedural default. As such, Petitioner's claims of prosecutorial misconduct will be dismissed as procedurally barred.

### B.  Ineffective Assistance of Counsel

Petitioner claims that he received ineffective assistance of counsel from his trial attorney with respect to counsel's failure to ensure that he and his co-defendant received separate trials, and counsel's failure to interview witnesses and present defense theories [Doc. 2].

### 1.    Applicable Law

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  A criminal defendant's Sixth Amendment right to counsel necessarily implies the right to "reasonably effective assistance" of counsel.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Under the *Strickland* standard for proving ineffective assistance of counsel, a defendant must meet a two-pronged test: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense.  *Id*.

Proving deficient performance requires a "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed defendant by the Sixth Amendment."  *Id*.  The appropriate measure of attorney performance is "reasonableness under prevailing professional norms."  *Id*. at 688.  A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged to not have been the result of reasonable professional judgment."  *Id*. at 690.  The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential."  *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).  It is strongly presumed that counsel's conduct was within the wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 689.

The second prong, prejudice, "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable." *Id*. Here, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003) (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted). Counsel is constitutionally ineffective only if a performance below professional standards caused the defendant to lose what he "otherwise would have probably won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).

### 2. Discussion

Petitioner argued to the post-conviction trial court that his trial counsel was ineffective for failing to move to sever his trial from that of his co-defendant, for failing to present an alibi defense, for failing to present proof at sentencing, and for failing to present proof of his intoxication. *McGaha*, 2011 WL 2162987, at *6. The TCCA, applying *Strickland v. Washington*, concluded that Petitioner had not met his burden of proving deficient performance or prejudice. *Id*. at *9–13. Thus, the task before the Court is to determine whether the state court's application of *Strickland* to the facts of Petitioner's case was unreasonable.

### a. Failure to File Motion to Sever.

As his first instance of ineffective assistance, Petitioner contends that his trial counsel failed to move to sever his trial from his co-defendant [Doc. 2]. Petitioner alleges that counsel's failure to move for a severance deprived him from a fair trial because he was unable to present essential evidence due to the psychological and emotional burden of being tried with a family member [Doc. 3]. According to Petitioner, counsel's failure in this aspect was unreasonable.

A petitioner bears a heavy burden to show that he was denied a fair trial by the failure to sever his trial from a co-defendant's when both allegedly participated in the same offense. *See United States v. Horton*, 847 F.2d 313, 317 (6th Cir. 1988); *see also Richardson v. Marsh*, 481 U.S. 200, 210 (1987) (noting that joint trials avoid inconsistent verdicts and the scandal and inequity of such verdicts and also enable a more accurate assessment of relative culpability). Under Tennessee law, a defendant is entitled to severance from other defendants if it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants. Tenn. R. Crim. P. 14(c)(2)(i). The decision of whether or not to grant a severance is solely within the trial judge's discretion. *See Glinsey v. Parker*, 491 F.2d 337, 343 (6th Cir. 1974).

When a petitioner challenges counsel's failure to file a motion to sever, the petitioner "must demonstrate that the outcome of his trial would have been different but for counsel's errors." *United States v. Walker*, No. 96-2419, 2000 WL 353518, at *5 (6th Cir. Mar. 30, 2000). Petitioner merely states that because he was not tried alone, "he was denied the right to introduce evidence of a highly probative and exculpatory nature" [Doc. 2, p. 12]. Petitioner's conclusory statement here is not sufficient to show that he was prejudiced by counsel's failure to file a motion to sever the trial. Since Petitioner cannot show prejudice, the Court need not reach the question of deficient performance. *See Strickland*, 466 U.S. at 697 (concluding that because both the performance prong and prejudice prong must be satisfied, if a petitioner cannot satisfy one prong, the other need not be examined). As such, the Court cannot find that the Petitioner is entitled to relief on this claim because the state court's determination of the facts before it was not unreasonable.

**b.      Failure to Interview Witnesses and Present Defense Theories.**

Petitioner's next claim of ineffective assistance of counsel alleges that his trial counsel was ineffective for failing to interview witnesses and present viable defense theories [Doc. 2]. Particularly, Petitioner argues that counsel made no effort to interview and present three separate witnesses that would have provided him with an alibi for the time of the shooting [Doc. 2]. According to Petitioner, counsel failed to interview the witnesses, failed to present an alibi defense, advised Petitioner against taking the stand, and generally failed to present any piece of evidence in Petitioner's defense [Doc. 2].

*Strickland* imposes upon an attorney "the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Ramonez v. Berghuis*, 490 F.3d 482, 487 (6th Cir. 2007) (citing *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005)). At the post-conviction hearing, counsel testified that she did in fact talk to the witnesses Petitioner references, and they had offered to testify in support of Petitioner's alibi defense. *McGaha*, 2011 WL 2162987, at * 11. However, counsel stated that she thoroughly researched the timeline surrounding the murder and determined that the witnesses' testimony would not actually constitute an alibi. *Id.* Furthermore, counsel testified that she did not believe that the testimonies would be helpful to Petitioner; rather, she feared that the testimony would open the door to Petitioner's prior murder conviction. *Id.*

Here, Petitioner has not overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Under *Strickland*, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690. Petitioner has failed to show that there was no thorough investigation of the witnesses or viable defense theories in this case. *See, e.g., Webb v. Mitchell*, 586 F.3d 383, 395 (6th Cir. 2009) (observing that the petitioner had failed to

14

"overcome the 'strong presumption' that his trial counsel conducted a reasonable investigation." (citation omitted)). In fact, the testimony presented to the post-conviction court indicates otherwise; counsel did talk to Petitioner's alibi witness, and only after a thorough investigation of the facts in connection with their testimony did she decide that it was not in Petitioner's best interest to present their testimony.

Accordingly, the Court cannot find that Petitioner is entitled to relief on this claim because the state court's decision was not an unreasonable determination of the facts in light of the evidence presented to it.

## C.    Failure to Cure Juror Prejudice

Petitioner next argues this the trial court erred in failing to declare a mistrial after members of the jury saw him in shackles and handcuffs [Doc. 2]. Petitioner contends that allowing members of the jury to see him in handcuffs and shackles "left an unreliable mark of infamy in the minds of the jurors," and violated his constitutional right to a fair and impartial trial [Doc. 2].

### 1.    Applicable Law

"A principal ingredient of the due process clause is that every criminal defendant is entitled to a fair and impartial trial." *Kennedy v. Cardwell*, 487 F.2d 101, 104 (6th Cir. 1973) (citing *Massey v. Moore*, 348 U.S. 105, 108 (1954)). For a defendant to receive a fair trial, "it necessarily follows that a criminal defendant is entitled to the physical indicia of innocence." *Id.* (citing *United States v. Samuel*, 431 F.2d 610, 614 (4th Cir. 1970)). This right to be free from prejudicial practices, however, is not absolute. *See Holbrook v. Flynn*, 475 U.S. 560, 568 (1986) (finding that the presence of a large number of law enforcement officials did not offend the petitioner's constitutional rights); *see also Illinois v. Allen*, 397 U.S. 337, 344 (1970) (holding

that binding and gagging, while probative of negative feelings towards the defendant, may be the most reasonable way to handle a disruptive defendant).  On habeas review, a federal court is only permitted to "look at the scene presented to the jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to [petitioner's] right to a fair trial." *Holbrook*, 475 U.S. at 572.

## 2.    Discussion

Here, the record indicates that when Petitioner was being brought into the courtroom on the second day of trial, the officers inadvertently led him past a number of jury members while Petitioner was still handcuffed.  *McGaha*, 2008 WL 148943, at *7.  However, when counsel for Petitioner and Petitioner's co-defendant brought this to the attention of the trial court, they told the court that the court did not need to give curative instructions, but that they just wanted to bring it to the court's attention for future purposes.  *Id*. at *8.  The state court found that Petitioner cannot now claim that the trial court erred in failing to declare a mistrial or provide a curative instruction, after specifically telling the court not to administer an instruction to the jury. *Id*.  Even further, the state court found that Petitioner did not suffer any prejudice from the sighting.  *Id*. at *9.

The Court cannot find that the state court's decision was an unreasonable application of well-established federal law, or that the state court unreasonably determined the facts in light of the evidence presented before it.  There is no evidence from which the Court can conclude that Petitioner was prejudiced by the brief sighting here.  *See, e.g., United States v. Chapman*, 513 F.2d 1262 (6th Cir. 1975) (failing to find prejudice where the defendant was seen in handcuffs by jurors only for a brief period); *United States v. Crane*, 499 F.2d 1385 (6th Cir. 1974) (same). Accordingly, the Court finds that Petitioner is not entitled to habeas relief on this claim.

### D. Sufficiency of the Evidence[2]

Petitioner's next two claims assert that there was insufficient evidence introduced at trial to support his convictions, and that the trial court erred by finding that there was sufficient proof of premeditation to support the first degree murder verdict [Doc. 2]. In support of this claim, Petitioner argues that the state did not introduce any fingerprints, ballistic, or DNA evidence that could connect him to the murder [Doc. 2].

### 1. Applicable Law

The United States Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307 (1979), provides the controlling rule for resolving claims of insufficient evidence. *See Gall v. Parker*, 231 F.3d 265, 287–88 (6th Cir. 2000) (identifying *Jackson* as the governing precedent for claims of insufficient evidence), *superseded by statute on other grounds as recognized by Parker v. Matthews*, 132 S. Ct. 2148 (2012). In *Jackson*, the Supreme Court held that evidence, when viewed in the light most favorable to the prosecution, is sufficient if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 443 U.S. at 319. Resolving conflicts in testimony, weighing the evidence, and drawing reasonable inferences from the facts are all matters which lie within the province of the trier of fact. *Id.*; *see also Cavazos v. Smith*, 132 S. Ct. 2, 6 (2011) ("[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" (quoting *Jackson*, 443 U.S. at 326)).

A habeas court reviewing an insufficient evidence claim must apply two levels of deference. *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007). Under *Jackson*, deference is

---

[2] Petitioner presents his claims that there was insufficient evidence to support his convictions and that there was no proof of premeditation as two separate claims; however, the state court addressed both claims together. The Court will do the same here.

owned to the fact finder's verdict, "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (citing *Jackson*, 443 U.S. at 324 n.16). Under AEDPA, deference is also owed to the state court's consideration of the trier-of-fact's verdict. *Smith*, 132 S. Ct. at 6 (noting the double deference owed "to state court decisions required by § 2254(d)" and "to the state court's already deferential review."). Hence, a petitioner bringing a claim of insufficient evidence "bears a heavy burden." *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986).

## 2. Discussion

In its opinion, the TCCA discussed the definition of the offenses of first degree murder and aggravated assault in Tennessee. Citing to Tenn. Code Ann. § 39-13-102(a)(1)(B), the TCCA stated: "The statutory definition of aggravated assault relevant to the instant case is the intentional or knowing commission of an assault within the meaning of Tennessee Code Annotated Section 39-13-101 while using or displaying a deadly weapon." *McGaha*, 2008 WL 148943, at *5. The court went on to define a deadly weapon as including a firearm, and stated that a firearm is "defined as 'any weapon designed, made or adapted to expel a projectile by the action of an explosive or any device readily convertible to that use.'" *Id*. (quoting Tenn. Code Ann. § 39-11-106(a)(11)). The TCCA next noted that "[f]irst degree murder, as relevant [here], is defined as a premeditated and intentional killing of another." *Id*. (citing Tenn. Code Ann. § 34-13-202(a)(1)).

The TCCA, citing to *Jackson v. Virginia*, stated that where a defendant challenges the sufficiency of the evidence, the court must reject the challenge if, after considering the evidence in the light most favorable to the prosecution, the court determines that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *McGaha*, 2008

WL 148943, at * 4. Thus, the Court must now determine whether the state court's application of *Jackson* to the facts of Petitioner's case was unreasonable.

Summarizing the proof which sustained Petitioner's aggravated assault conviction, the TCCA pointed to evidence showing that Petitioner went into Lisa Mathis's home, and while she was calling 9-1-1, he pointed his rifle at her head, holding it so close to her face that she could have reached out and grabbed the barrel, and told her to drop the telephone. The court also noted that witness testimony indicated that the Petitioner entered the bedroom in Lisa Mathis's home with an assault rifle after his co-defendant had fired a first shot, and while his co-defendant was struggling with the victim, Petitioner shot the victim with his rifle. The court pointed to evidence that showed that a single handgun cartridge casing was discovered on the bed and one rifle cartridge casing was discovered on the floor, along with bullet holes in the mattress and in the wall of the bedroom. As such, the court concluded that the evidence, when viewed in the light most favorable to the state, was sufficient to sustain Petitioner's aggravated assault and first degree murder convictions.

With regard to Petitioner's argument that there was no evidence to support premeditation, the court pointed to testimony of a witness that stated that Petitioner shot the victim at the order of his co-defendant, and when Petitioner's co-defendant asked Petitioner to also shoot the witness, Petitioner refused. The court stated that this indicates that Petitioner was calm enough immediately after the killing to make the decision not to shoot another person. The court also noted that Petitioner did not render aid to the victim. Noting that premeditation is a question for the jury, and that it was required to view the evidence in the light most favorable to the prosecution, the court concluded that any rational trier of fact could have found premeditation beyond a reasonable doubt.

Here, the Court cannot find that Petitioner has presented any evidence to indicate that the state court unreasonably determined that the proof presented in Petitioner's case was sufficient to support the convictions. The state court's application of the *Jackson* standard was not unreasonable nor was its decision based on an unreasonable factual determination. As such, the Court finds that Petitioner is not entitled to relief on these claims.

### E. Trial Court's Failure to Recuse Itself

Petitioner next alleges that the trial court erred in failing to recuse itself after his co-defendant's father accused the court of improperly interacting with the victim's family members [Doc. 2]. Petitioner argues that the trial court should have recused itself because the court was unquestionably prejudiced against him and his co-defendant, and that but for the court's partiality, he "would have received instructions on lesser included offenses, as well as had expert witnesses provided by the [c]ourt to help provide a defense" [Doc. 2].

#### 1. Applicable Law

Where a procedural default prevents a petitioner from raising a claim, a court in the Sixth Circuit must apply the following four-factor analysis: (1) whether there is a procedural rule which applied to a petitioner's claim and whether a petitioner complied with the rule; (2) whether the procedural rule was actually enforced against a petitioner; (3) whether the rule is an adequate and independent state ground sufficient to block habeas review; and (4) whether a petitioner can demonstrate cause for his failure to comply with the rule, and prejudice resulting from the alleged constitutional violation. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also Beuke v. Houk*, 537 F.3d 618, 630 (6th Cir. 2008). A district court may, *sua sponte*, raise a petitioner's procedural default, even if the state failed to raise the defense. *See*

*Day v. McDonough*, 547 U.S. 198, 209 (2006); *Sowell v. Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004).

### 2. Discussion

In Tennessee, a defendant is required to prepare a record that conveys a fair, accurate, and complete account of what occurred with respect to the issues which form the basis of his appeal. Tenn. R. App. P. 24(b). If the record contains nothing to support a claim of error, then that alleged error will not be considered on appeal. *Jackson v. State*, 539 S.W.3d 337 (Tenn. Crim. App. 1976); *State v. Meeks*, 779 S.W.2d 394 (Tenn. Crim. App. 1988) (finding that the failure to provide a transcript of a sentencing hearing constitutes a waiver of the sentencing issue). Here, the TCCA stated that "The [Petitioner] has waived this issue because no transcript of [his co-defendant's] sentencing hearing is included in the record before this [c]ourt. . . . Without a complete and proper record, this [c]ourt is precluded from considering the issue." *McGaha*, 2008 WL 148943, at * 7 (citations omitted). The state court's application of the state procedural rule to bar consideration of the claim operates as a procedural default.

As noted, federal review of a procedurally defaulted claim is precluded, unless the habeas petitioner can show cause to excuse his failure to comply with the state procedural rule, and actual prejudice resulting from the alleged constitutional violation. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Cause "requires a showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). A petitioner demonstrates prejudice by establishing that his trial was infected with constitutional error, and that the constitutional error worked to the petitioner's actual and substantial

disadvantage. *Franklin*, 464 F.3d at 417; *see also United States v. Frady*, 56 U.S. 152, 170 (1982).

Petitioner does not directly allege cause and prejudice, but instead argues that his counsel was ineffective for failing to obtain a transcript of his co-defendant's sentencing proceedings which would have reflected the confrontation between the trial court and his co-defendant's father [Doc. 2]. Ineffective assistance of appellate counsel may serve as cause for procedural default, but only if counsel is constitutionally ineffective under the *Strickland* standard. *Murray*, 477 U.S. at 488–89. However, before ineffective assistance of counsel can be cause, the issue of ineffective assistance of counsel must itself have been exhausted in the state courts. *See Edwards v. Carpenter*, 529 U.S. 446, 450–51 (2000) ("A procedurally defaulted ineffective-assistance-of-counsel claim can serve as cause to excuse the procedural default of another habeas claim only if the habeas petitioner can satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself.").

Here, the Court has previously found that Petitioner procedurally defaulted on this ineffective assistance of counsel claim by failing to raise it before the TCCA, and that Petitioner failed to allege cause and prejudice to excuse the default. As such, the Court cannot find that this defaulted claim of ineffective assistance is sufficient to excuse Petitioner's default of this habeas claim. Having failed to show cause and prejudice, Petitioner's claim that the trial court erred in failing to recuse itself is barred by his procedural default, and cannot be reviewed by this Court.

F. **Actual Innocence**

Petitioner's final claim is that he is actually innocent of the crimes for which he was convicted, and that the Court must grant an evidentiary hearing "to resolve the controversy surrounding the factual questions of whether or not the Petitioner's actual innocence claim is

meritorious or not" [Doc. 2].  Particularly, Petitioner alleges that a telephone conversation that he had with a number of family members indicates that it was physically impossible for him to have committed the crimes of which he was convicted of [Doc. 2].

Respondent argues that this claim should be dismissed because a freestanding actual innocence claim does not raise a basis for federal habeas relief [Doc. 6].  The Court agrees. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation in the underlying state criminal proceeding."  *Herrera v. Collins*, 506 U.S. 390, 400 (1993) (citing *Townsend v. Sain*, 372 U.S. 293, 317 (1963)).  Here, Petitioner's claim of actual innocence is not cognizable on habeas relief and, as such, must be dismissed.[3]

## V.    CONCLUSION

For the above mentioned reasons, the Court finds that none of Petitioner's claims warrant issuance of a writ.  Therefore, Petitioner's petition for a writ of habeas corpus [Doc. 2] will be **DENIED** and **DISMISSED.**

## VI.    CERTIFICATE OF APPEALABILITY

The Court must consider whether to issue a Certificate of Appealability ("COA"), should Petitioner file a notice of appeal.  Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  Where a claim has been dismissed on the merits, a substantial showing is

---

[3] To the extent that Petitioner argues that this claim of actual innocence should act as cause to excuse the procedural default of any of his claims, the Court finds that this argument is without merit as Petitioner has failed to produce any new and reliable evidence to support this claim.  The affidavits submitted by Petitioner merely allege that several of his family members would have testified on his behalf, had they been called to do so [Doc. 8].  These affidavits do not rise to the level of credibility required for such a claim under *Schlup v. Delo*, 513 U.S. 298, 324 (1995) ("To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.").

23

made if reasonable jurists could conclude the issues raised are adequate to deserve further review. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a claim has been dismissed on procedural grounds, a substantial showing is demonstrated when it is shown that reasonable jurists would debate whether a valid claim has been stated and whether the court's procedural ruling is correct. *Slack*, 529 U.S. at 484.

After reviewing each of Petitioner's claims, the Court finds that reasonable jurists could not conclude that Petitioner's claims are adequate to deserve further review, nor would reasonable jurists debate the correctness of the Court's procedural ruling. As such, because Petitioner has failed to make a substantial showing of the denial of a constitutional right, a COA will not issue.

ENTER:


_____
s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE